```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

PRECISION STONE, INC.,

                    Plaintiff,           04 Civ. 9996 (RWS)

    -against-                            OPINION

ARCH INSURANCE COMPANY and
LUMBERMENS MUTUAL CASUALTY CO.,

                    Defendants.

------------------------------------X
```



A P P E A R A N C E S :

Attorneys for Plaintiff

GOETZ FITZPATRICK LLP
One Penn Plaza, 44th Floor
New York, NY 10119
By:  JANE GOETZ, ESQ.

Attorneys for Defendants

DELBELLO DONNELLAN WEINGARTEN
  TARTAGLIA WISE & WIEDERKEHR, LLP
One North Lexington Avenue
White Plains, NY 10601
By:  PATRICK M. REILLY, ESQ.

**Sweet, D.J.,**

Upon all the proceedings had heretofore and upon the following findings of fact and conclusions of law, judgment will be entered in favor of the plaintiff, Precision Stone, Inc. ("Precision" or the "Plaintiff"), against the defendants, Arch Insurance Company and Lumbermens Mutual Casualty Company (the "Defendants" or the "Sureties"), on the labor and material payment bond (the "Bond") that the Sureties issued in connection with a construction project in White Plains, New York.

The difficulties presented in the course of the construction, described below, are responsible for the controversy and this resulting contract action.

**Prior Proceedings**

This action was initiated by the filing of a complaint by Precision on December 17, 2004. Discovery proceeded.

The action was tried to the Court on September 19, 20 and 25, 2006. At the close of the Plaintiff's case, the Sureties moved to dismiss on the grounds that the action was time-barred as a result of the requirement in the Bond that any action be commenced within one year after work ceased on the project. By oral opinion on September 25, 2006, the motion was denied based upon the January

1

4, 2004 punch list of work yet to be done. Final submissions were filed on November 6, 2006.

**The Facts**

In November 2002, the City of White Plains (the "City") granted George A. Fuller Company ("Fuller"), a construction company, a no-bid contract to be the general contractor for the construction of a new high-tech fountain and plaza along with the build-out of a public community theater (the "Projects") within the City Center high-rise complex then under construction. Louis Cappelli ("Cappelli") was the developer of the City Center and the owner of Fuller. He represented to the City that the total development and construction costs for both Projects, including the expenses incurred for the design and architect fees, would not exceed a certain amount of money that the City allocated and that Cappelli/Fuller would pay or absorb any costs in excess of that amount. (City of White Plains, Official Proceedings of the Common Council, vol. 88, no. 51 (November 4, 2002), attached as Exhibit 1 to Pl.'s Post Trial Mem.)

Cappelli also represented to the City that he wanted to substantially complete the construction of the Fountain and the Public Theater by the end of October 2003 (before Election Day) which was also the projected completion date of the City Center. The Bond issued by the Sureties, which are foreign corporations,

was executed on April 16, 2003 for the benefit of persons who furnished labor and/or materials for the Project pursuant to the Bond's terms and conditions. The Bond has not been voided and there are no issues of fact or law as to the validity and procurement of the Bond. The Bond provided that

> any beneficiary-claimant hereunder who has not been paid in full within ninety (90) days after the date on which the last of such claimant's work or labor was done or performed or materials furnished, may sue the Surety and Principal on this bond for such sum as may be justly due, provided, however, that no such suit or action shall be commenced hereunder by such claimant after the expiration of one (1) year following the date on which the Principal ceased work on said contract nor other than in a State Court or United States District Court or competent jurisdiction in and for the County or District in which the contract work is situated.

(Pl.'s Trial Ex. 1.)

On May 8, 2003, at the request of HRH Construction LLC ("HRH"), the construction manager for Fuller, Precision, a New York corporation, submitted a bid for the stone work for the fountains and the plaza for a total price of $536,665.00. On May 14, 2003, HRH issued Precision a "Letter of Intent" to perform the stone work for an agreed contract price of $515,000.00. The Letter of Intent prepared by HRH to Precision provided as follows: "This agreement is in accordance with drawings and specifications from Sasaki dated 5/14/03 and is subject to the execution of the formal contract by Cappelli Enterprises to follow." (Pl.'s Trial Ex. 4.)

3

Precision's Project Manager, Robert Shedrofsky ("Shedrofsky"), signed the Letter of Intent with qualifiers and conditions that he added to the Letter of Intent, namely, that the agreement was for "scope of work defined by Precision proposal dated 5/8/03" because the "drawings and specs do not match [the actual] work [required.]" Shedrofsky testified that he wanted to be clear that the architectural drawings prepared could not be used to build the stone work for the fountain because they "didn't represent the job that was described" and "didn't make any sense." (Trial Tr. of Sept. 19, 2006, at 13-14.) In addition, Precision conditioned acceptance of the Letter of Intent by incorporating its May 8, 2003 proposal which excluded overtime work. At the time the Letter of Intent was issued, Precision was not provided with a completion date.

Precision did not receive any schedules from HRH during the course of the Project, but was told that Fuller wanted the Project to be completed by the end of October. (Id. at 30.)

Precision first submitted its shop drawings, without which it could not order the stone, on June 3, 2003. Shedrofsky and Jon Tibett ("Tibett"), the owner of Precision, are both qualified and experienced contractors in the stone business for over twenty-five years, and were credible witnesses. According to Tibett, shop drawings are the most critical part of the process in

4

this type of project because they are the "road map for the entire installation and everything that comes before [Precision's work.]" (Trial Tr. of Sept. 25, 2006, at 103.) The architect for the Project reviewed Precision's shop drawings and returned them to Precision as "rejected" on June 20, 2003.

On June 25, 2003, HRH wrote to Tibett complaining that Shedrofsky would not agree to order the stone pavers without HRH's approval of the shop drawings. Shedrofsky responded on June 26, 2003:

> You are correct in your last paragraph wherein you state that the stone production must conform to approved shop drawings. Unfortunately, [to] this date we do not have approved drawings and still don't have final coordinated dimensions. The Architect[']s note on our shop drawings state that the GC is to coordinate the dimensions with the other trades. Someone needs to approve the dimensions on our drawings. Your demand that we immediately order stone (when you know that we don't have approved shop drawings) in one sentence and in another sentence reiterate that the need to have approved shop drawings before production is more than a bit confusing. Yesterday, I spoke to you about the Architect[']s note that changed the stone coping to 1'-4" from 1'-0". You weren't sure of why this change was made and were to get back to me. I would like to know how we were supposed to order stone when you yourself don't know what size the coping is suppose[d] to be.

(Pl.'s Trial Ex. 7.) Precision then submitted its second set of shop drawings on June 27, 2003. These drawings were approved and returned to Precision on July 7, 2003. Precision placed its order to Brazil for the stone materials on July 11, 2003. Because of the delay in approval of the shop drawings, Precision was issued a

5

change order in the amount of $50,000.00 in order to accelerate the fabrication of the granite and have the stone air-freighted to the site from Brazil.

At this early stage, the differences between the construction manager, HRH, and the subcontractor, Precision, became evident. On August 12, 2003, Precision wrote to HRH and agreed to (a) start the pond installation on August 25, 2003; (b) complete the black granite installation by October 17, 2003; (c) start the paver installation on September 15, 2003; and (d) complete the paver installation by October 27, 2003. However, Precision stated that in order to meet these dates, the following conditions were necessary:

1. In order to transport materials around the site a clear path of poured concrete substrate will be needed at all locations.
2. Complete true substrates will be completed 1 week prior to scheduled installation.
3. An irrevocable addition to contract payment of $50,000.00 provided to Precision Stone Inc. (By 8/15/03) to cover fabrication overtime and air freight of material.
4. COD payment for material as it is delivered to the site.

(Pl.'s Trial Ex. 9.)

On August 18, 2003, Precision did a preliminary layout of Pond No. 4 and discovered that the size of the concrete foundation was not correct. Precision brought this to HRH's attention in a letter dated August 18, 2003, and advised that the sizing of

6

substrates was an "urgent" matter. Despite Precision's warning that the substrates for Pond No. 4 were not built according to plan, HRH allowed the concrete contractor to proceed with Pond No. 3 in the same manner, and it was also built to the wrong dimensions. On August 26, 2003, after a meeting on the job site, HRH decided to have a demolition crew cut back the concrete to the needed dimensions. Precision documented these discussions by preparing Meeting Minutes. This activities created confusion on the job site and delayed Precision's start date for the stone installation.

The delays caused by the resizing of the substrates were the basis for HRH ordering Precision to perform its work on overtime. Precision paid a total of $37,292.19 in overtime wages for work it performed at HRH's direction.

On September 15, 2003, Precision wrote the following letter to HRH:

> Your letter dated 9/9/03 has criticized the mobilization and manning of the stone installation that we are contractually obligated to finish by 10/24/03. This criticism totally misrepresents the facts regarding our agreement and the status of the work available for our installation.
>
> Firstly to date we still do not have a contract for this installation. We did agree with Louis Cappelli that we would use the additional $50,000.00 that he offered to expedite delivery of material and we would do our best to complete the installation by 10/24/03. All parties understood that we would need to start working on pond #3 & #4 on 8/25/03. It was also understood that to complete

7

>  this very aggressive schedule that we would need to work on numerous areas without delays caused by incomplete substrates.
>
>  It is now 9/16/03 and the substrate work on Pond #3 and Pond #4 is still not complete. Today is the first day we can install stone on Pond #3 and due to adjustments needed to the substrate on Pond #4 we are stopped from working on that Pond.

(Pl.'s Trial Ex. 13.)

On September 27, 2003, Fuller sent a proposed contract to Precision. Precision did not sign the contract and crossed out the time-of-the-essence provision when it returned the unsigned contract draft.

Shedrofsky testified that Precision was not told by HRH that it was going to take the paver work out of Precision's scope of work and only first became aware of this when another contractor, Berardi Stone ("Berardi") showed up on the site in early October 2003 and started the paver installation. (Trial Tr. of Sept. 19, 2006, at 51.) Precision did not agree to this change in the scope of its work. The pavers (installed by Berardi) were supplied by Precision, unloaded by Precision and stacked and stored by Precision. Fuller paid Berardi $143,520.00 for paver installation using a $16 per square foot unit price and made overtime payments of $33,184.00, and has offset these amounts from the moneys claimed by Precision. This offset reinforces Precision's claim that it too was required by HRH to commit to

8

overtime payments.

HRH and Fuller have also asserted an offset of $40,700.00 for use of Fuller's cherry picker on the site and $14,800.00 for the labor costs of operating the cherry picker. Shedrofsky and Tibett testified that there was a handshake agreement in the field between Jon Bush, the site foreman for Precision, and Jim Green, HRH's superintendent, that because of the rough terrain resulting from the demolition of the incorrectly constructed substrates along with the addition of a Starbucks Kiosk to the Project, it was not possible for Precision to use its lull (a telescoping forklift), and accordingly that Precision could use Fuller's cherry picker to move the pavers. Precision had delivered the lull to the Project site in early September but was unable to use it for most of the job due to the job site conditions and because the only other access to the site was blocked by HRH's crane. The photographs of the Project site conditions established that there would be no way to access the lull. As Shedrofsky testified:

> [Y]ou have to understand that we didn't need [the cherry picker]. The way that the job was, we had a lull on that job. That's a big machine that carries a lot of heavy stones that needs a flat surface and a clear path to move around the site. And then to be able - we were going to use that machine - that was the machine intended to use for this installation. The problem [that] arose was that the substrate that was supposed to be clear and open was not. It was - there were [t]renches throughout the site. It was so many people working on the site. It was not anything that where this lull was going to be able to be used. And we were going to save time. Jim - Jim Green deemed it necessary to save that time and to use the cherry picker.

9

(Trial Tr. of Sept 19, 2006, at 68-70.) Shedrofsky further testified that the companies "traded off" and that HRH sometimes used Precision's lull.

Burton's contrary testimony that he had discussions with Shedrofsky that Precision was going to be charged for its use of the cherry picker is not supported by any documentation. HRH did not deny that it used Precision's lull and did not pay Precision for its use. The Sureties have not produced any evidence concerning the rental rate for the cherry picker or the number of days of use. In addition, Precision possessed its own cherry picker. The testimony concerning the swap agreement is credible. The back charge for the cherry picker is not.

The amount of the materials and labor provided by Precision are as follows:

|  |  |  |
|---|---|---|
| Base Contract Price: | | $515,000.00* |
| Change Orders: | | |
| #1 | Air Freight | $ 50,000.00* |
| #2 | Saturday Delivery | $  1,500.00 |
| #3 | Overtime #1 | $ 21,416.67 |
| #4 | Overtime #2 | $ 15,875.52 |
| #5 | Shop Drawings | $  4,000.00* |
| #6 | Paver Installation | $  3,648.00* |
| #7 | Paver Credit for Berardi Payment including overtime | ($176,604.00) |
| TOTAL ADJUSTED CONTRACT | | $434,836.19 |
| Less Payments Received | | $334,758.50* |
| **BALANCE DUE** | | **$100,077.69** |

\* Not disputed by the Parties.

10

The punch list established that as of March 2004, Fuller was still performing physical work on the Project and had consequently not ceased work. The Sureties did not establish that the work performed by Fuller was remedial.

**Conclusions of Law**

There is jurisdiction over this action under 28 U.S.C. § 1332.

Precision is entitled to payment for its material and labor under the Bond in the amount it expended, less the credit resulting from the substitution of Berardi with respect to the installation of the pavers. Under New York law, the statute of limitations operates as an affirmative defense. Maslan v. Am. Airlines, 885 F. Supp. 90, 93 (S.D.N.Y. 1995). The Defendants have the burden of making a prima facie showing that the limitations period had expired before Precision filed its action. Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995). The Sureties did not meet their burden to establish that the work performed after December 17, 2003 was merely remedial. As stated in the oral opinion of September 25, 2006, the Precision action was timely under the Bond.

Precision has sought its attorneys' fees in this action under section 137(4)(c) of the New York State Finance Law, which

11

provides in pertinent part that "[t]he Court may determine and award reasonable attorneys' fees to either party to such action [to recover upon a payment bond issued on a public Project] when, upon reviewing the entire record, it appears that either the original claim or the defense interposed to such claim is without substantial basis in fact of law." N.Y. State Fin. Law § 137(4)(c) (McKinney 2007). While unavailing, the defense and offset urged by the Sureties was not without some substance. Under the facts found above, it is not appropriate to award attorneys' fees to Precision.

## Conclusion

Upon the findings and conclusions set forth above, judgment will be granted in favor of Precision in the amount of $100,077.69 with costs and disbursements.

Submit judgment on notice.

New York, NY
February    , 2007

ROBERT W. SWEET
U.S.D.J.