UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PRECISION STONE, INC.,                                    Case No. 04-CV-9996(RWS)


                              Plaintiff,


           -against-


ARCH INSURANCE COMPANY and
LUMBERMENS MUTUAL CASUALTY CO.,

                              Defendants.
-------------------------------------------------------------X



## PLAINTIFF'S POST TRIAL MEMORANDUM OF LAW



GOETZ FITZPATRICK LLP
Attorneys for Plaintiff
One Penn Plaza, 44th Floor
New York, New York 10119
(212) 695-8100

## **TABLE OF CONTENTS**

Table of Authorities ............................................................... ii

INTRODUCTION............................................................... 1

STIPULATED FACTS AND SUMMARY OF CLAIMS............................... 1

    Plaintiff's Cause of Action............................................... 1

    Defendants' Affirmative Defenses....................................... 2

BACKGROUND............................................................... 3

POINT 1    Precision Proved at Trial
              That it Is Entitled
              to its Contract Balance of $142,131.69........................ 5

POINT 2    The Court's Decision Finding Plaintiff's
              Complaint Was Filed Within One Year after
              the Principal 'Ceased Work'
              Is the Law of the Case................................... 17

POINT 3    Defendants' Have  Waived Their
              Right to a "Setoff"....................................... 19

POINT 4    Plaintiff Should Be Awarded
              Attorneys' Fees as Defendants'
              Defense Was Baseless................................... 21

CONCLUSION................................................................ 23

## TABLE OF AUTHORITIES

Affiliated Music Enterprises v. Sesac, Inc.,
  17 F.R.D. 509 (S.D.N.Y.1955)................................................................ 20

Arizona v. California, 460 U.S. 605 (1983)........................................... 18

Beninati Roofing & Sheet Metal Co., Inc., v. Gelco Builders Inc.,
  279 A.D.2d 412 (1st Dept. 2001)......................................................... 21

Bernard v. U.S. Aircoach, 117 F.Supp.134 (S.D.Cal.1953................................ 20

Christianson v. Colt Indus. Operating Corp.,
  486 U.S. 800 at 816 (1988).................................................................. 18

Dobbs v.Vornado, Inc., 576 F.Supp.1072 (E.D.N.Y.1983................................... 20

Heller Fin., Inc. v. Midwhey Powder Co.,
  883 F.2d 1286 (7th Cir.1989)............................................................... 20

Liona Corp. v. PCH Assocs. (In Re PCH Assocs.),
  949 F.2d 585 (2d Cir.1991)................................................................... 18

Maslan v. American Airlines, 885 F.Supp.90 (S.D.N.Y. 1995)....................... 18

Minalga v. Fid. Invs. Institutional Operations Co.,
  2002 WL 31527251 (N.D.Ill. 2002)..................................................... 20

Overall v. Estate of Klotz, 52 F.3d 398 (2d Cir. 1995)................................... 18

Pennex Aluminum Co., a Div. of Metal Exchange Corp. v.
  International Fidelity Ins. Co., 818 F.Supp 772 (M.D. Pa. 1993).................. 22

R.W. Granger & Sons, Inc., and United States Fidelity &
  Guaranty Company v. Rojac Company, Inc.,
  1999 WL 461800 (2d Cir. 1999)......................................................... 21

Ranger Insurance Co. v. Culberson, 454 F.2d 857 (5th Cir.1971)................... 19

Riluc Co. v. Reliance Insurance Co.,
  181 A.D.2d 1048 (4th Dept. 1992)....................................................... 22

Satchell v. Dilworth, 745 F.2d 781 (2d Cir.1984)................................................ 19

Systems Inc. v. Bridge Electronics Co., 335 F.2d 465 (3rd Cir.1964).............. 19

Troxler v. Owens-Illinois, Inc., 717 F.2d 530 (11th Cir.1983)......................... 19

Worster Motor Lines, Inc. v. Lombardo,
   531 F.Supp.106 (W.D.Pa.1982)........................................................................ 19

## Statutes

5 C. Wright & A. Miller, *Federal Practice and Procedure,*
   Section 1278 at 339 (1969)................................................................................ 20

Blacks' Law Dict. 1376 (7th ed.1999)................................................................ 20

Blacks' Law Dict. 1280 (7th ed.1999)................................................................ 20

C. Wright & A. Miller, Federal Practice and Procedure
   Section 1278 at 343 (1969)................................................................................ 20

§137 of the New York State Finance Law........................................................... 22

## INTRODUCTION

Plaintiff, Precision Stone, Inc. ("Precision"), seeks judgment against the defendants, Arch Insurance Company and Lumbermens Mutual Casualty Co. (hereinafter referred to as "Defendants" or "Defendant Sureties"), pursuant to a labor and material payment bond (hereinafter referred to as "the Bond") issued by the Defendants, as sureties, and their principal, non-party George A. Fuller Company ("Fuller"), in connection with the construction project known as the Construction of the Plaza and Fountain at Main Street and Mamaroneck Avenue, White Plains, New York (hereinafter the "Fountain" and/or the "Project"). Precision proved at the trial hearings held on September 19, 20 and 25th that it is entitled to judgment in the amount of $142,131.69, plus interest as of January 1, 2004, which reflects the amount due Precision from Defendants' principal, Fuller, for the stone installation and related work it performed for Fuller at the Project.

## STIPULATED FACTS AND SUMMARY OF CLAIMS

1.     The Bond has not been voided and there are no issues of fact or law as to the validity of said Bond and the procurement of the Bond.

2.     The Bond is for the benefit of persons who furnished labor and/or materials for the Project pursuant to said Bond's terms and conditions.

3.     Precision furnished labor and materials for the Project pursuant to an agreement with Fuller and/or its agents.

### Plaintiff's Cause of Action

Plaintiff's complaint alleges only one cause of action against Defendants. Namely, an action seeking to recover against the Bond issued by the Defendants, as sureties, and their principal Fuller in connection with the Project. Precision seeks to recover $142,131.69, plus

interest, which reflects the amount due Precision from Fuller for the stone installation and related

work at the Project.  Precision's claim is broken down as follows:

| | |
|---|---|
| Base Contract Price | $ 515,000.00 * |
| CO#1  Air Freight | $   50,000.00 * |
| CO#2  Expedite Trans | $     1,500.00 * |
| CO#3  Overtime #1 | $   21,416.67 |
| CO#4  Overtime #2 | $   15,875.52 |
| CO#5  Shop Drawings | $     4,000.00 * |
| CO#6  Paver Installation | $     3,648.00 * |
| CO#7  Paver Credit | $ (134,550.00)[1] |
| TOTAL ADJUSTED CONTRACT | $ 476,890.19 |
| Less Payments Received | $ 334,758.50* |
| **BALANCE DUE** | **$ 142,131.69** |

* *Not disputed by the Parties.*

## Defendants' Affirmative Defenses

Defendants' first and second affirmative defenses allege that Precision's cause of action

is time barred pursuant to the provisions of the Bond which required any claimant to commence

an action with one year from the time Fuller ceased work on the Project.  Specifically,

Defendants allege that the Project was completed in the end of October 2003 which would

require Precision  to commence an action against the Bond by the end of October 2004.

Precision's complaint was filed on December 17, 2004.

---

[1]     Defendants contend that credit for the paperwork should be $143,520.00.

2

## **BACKGROUND**

In or about November 2002, the City of White Plains (the "City") granted Fuller, a Louis Cappelli owned construction company[2], a 'no bid contract' to be the general contractor for the construction of a new high tech fountain and plaza along with the build-out of a public community theater (collectively referred to as the "Projects") within Cappelli's City Center high rise complex then under construction. Cappelli represented to the City that the total development and construction costs for both Projects, including the expenses incurred for the design and architect fees, would not exceed a certain amount of money that the City allocated and that Cappelli/Fuller would pay or absorb any costs in excess of that amount. (See, The City of White Plains Official Proceedings of the Common Council, Vol. 88 City of White Plains, N.Y., November 4, 2002 No. 51 attached to the accompanying Appendix as Exhibit "1"). In addition, Cappelli pledged $1.6 Million of his own money for the development and construction of the Projects as a *quid pro quo* for zoning concessions made by the City to Cappelli. Id.

The City's public records report that Cappelli represented to the City that he wanted to "aggressively pursue the design and preliminary plans, specifications and cost estimates" for both Projects in such a manner so that the construction of the Fountain and the Public Theater would be substantially completed by the end of October 2003 (before Election Day) which was also the projected completion date of his City Center high rise complex. It is a matter of public record that at the time Precision submitted its bid to Fuller's Construction Manager, HRH Construction LLC ("HRH"), the construction drawings for the Fountain prepared by Cappelli's architects were

---

[2] Louis Cappelli is a well known developer in Westchester County.

3

'conceptual plans' and were not detailed blue print design specifications that would be required to build the Fountain.

The Fountain Project was behind schedule and delayed from its inception and all of the cost overruns associated with these delays were to be absorbed by Cappelli/Fuller pursuant to its agreement with the City.  To make matters worse, HRH exacerbated the delays by its failure and neglect to provide basic construction management services such as preparing industry standard critical path method ("CPM") schedules showing the time sequence and coordination for the work of all the trades, conducting  project meetings for coordinating the trade contractors' work, and timely responding (if at all) to requests for clarification or information on the design drawings.  In the words of HRH's Project Executive for the Project, Dan Burton ("Burton"), it was just plain 'mismanagement' (Burton Tr. 53).

Precision demonstrated during the trial that HRH, as agent for Fuller/Cappelli, acted in bad faith by directing Precision to perform its base scope of work on overtime in order to meet an Election Day opening ( Shedrofsky Tr. 27) with the intent not to pay Precision.  Fuller/Cappelli's motives for not paying Precision are self-evident; the Project cost overruns came directly out of Cappelli's pocket pursuant to Cappelli's agreement with the City and Cappelli intended to pass down its losses to the trade contractors, such as Precision.

4

## ARGUMENT

## POINT 1

### PRECISION PROVED AT TRIAL THAT IT IS ENTITLED TO ITS CONTRACT BALANCE OF $142,131.69

On or about May 8, 2003, at HRH's request, Precision submitted a bid for the stone work for a total price of $536,665.00 (Ex. 3)[3]. HRH negotiated Precision down on the price[4] and on May 14th, HRH issued Precision a "Letter of Intent" to perform the stone work for the agreed contract price of $515,000.00 (Ex. 4).

Precision's Project Manager, Robert Shedrofsky ("Shedrofsky")[5] testified on direct examination that he signed the Letter of Intent with qualifiers and conditions which he added to the Letter of Intent. Namely, that the agreement was for "scope of work defined by Precision's proposal dated 5/8/03" because the "drawings and specifications do not match the actual work required" (Ex. 4). Shedrofsky explained that he had to qualify Precision's scope of work because the architectural drawings Precision used to prepare its bid "didn't represent the job that was described to me [and] what they [HRH/Fuller] wanted to do" (Shedrofsky Tr.14). Shedrofsky

---

[3] Plaintiff's trial exhibits are exhibits ("Ex.") 1 though 18 and Defendants' trial exhibits are A through J.

[4] It is noteworthy that HRH's May 14, 2003 Letter of Intent shows that for all intents and purposes, Fuller and Cappelli were one in the same for purposes of this Project. The Letter of Intent prepared by HRH to Precision provides as follows:

> This agreement is in accordance with the drawings and specifications from Sasaki dated 5/14/03 *and is subject to the execution of the formal contract by Cappelli Enterprises to follow* (Ex. 4).

[5] Shedrofsky, at the time of the trial, was no longer employed by Precision and in fact started his own competing stone company in 2005.

5

testified that he wanted to be clear that the "architectural drawings prepared could not be used to build the stone work for the fountain because they simply didn't make any sense" (Shedrofsky Tr.14).   In addition, Precision conditioned acceptance of the Letter of Intent by incorporating its May 8, 2003 proposal (Ex. 3) which specifically *excluded* overtime work (Ex.3).   At the time the Letter of Intent was issued, Precision was never provided with a completion date (Shedrofsky Tr.16) and both Shedrofsky and Precision's owner, Jon Tibett, testified that Precision never received any schedules from HRH during the course of the entire Project nor could Burton, HRH's Project Manager, refer to any schedules prepared by HRH for the Project (Shedrofsky Tr.17; Tibett Tr.110; Burton Tr.63-64).   Later on, Precision was told that Fuller wanted the Project to be completed by the end of October (Shedrofsky Tr. 30).

As will be discussed in greater detail below, part of Precision's claim is for $37,292.19 in overtime work HRH directed and signed for on a daily basis that authorized Precision to perform overtime work in order to get the Fountain operating for Election Day because the stone work had been significantly delayed because of HRH's delay in approving shop drawings and because of Fuller's concrete subcontractor who incorrectly installed the concrete substrates which had to be corrected before Precision could install its stone work.   All of the overtime work by Precision are supported by individually signed and approved time and material tickets by HRH (Exs.16-17).   Burton admitted on cross examination that HRH/Fuller/Cappelli never intended to pay Precision for this work despite promising Precision that it would be paid (Burton Tr. 74). Precision will show that the Defendants' so-called back charges for the cherry picker crane and overtime for the paver installation work performed by another stone contractor are just 'smoke and mirrors' to provide Cappelli/Fuller with an excuse not to pay Precision.

6

Shedrofsky testified that almost immediately after HRH issued the Letter of Intent that he sensed that this Project was going to be riddled with problems and the first red flag was the issue concerning Precision's shop drawings.  Precision's first submission of its shop drawings was on June 3, 2003 (Ex. 8).  Both Tibett and Shedrofsky who are qualified and experienced contractors in the stone business for over twenty-five years, confirmed that without approved shop drawings by the architect, Precision could not order the stone.  Tibett explained on direct examination that the shop drawings were the most critical part of the process in this type of project because Precision's shop drawings were the "road map for the entire installation and everything that came before Precision's work" (Tibett Tr.103).

Burton was disingenuous when he discounted the importance of approved shop drawings before Precision could proceed with ordering the stone materials (Burton Tr. 9-10, 13-14) and actually contradicted himself as he also testified that it was "very important to get shop drawings established and get all the stone cut so that it could be there some time in August.  That was pretty much the time frame necessary to get it finished in October" (Burton Tr. 6).  The documentary evidence which cannot be disputed proves that Precision turned around a detailed set of shop drawings in less than 3 weeks which were very difficult to prepare because the architect's drawings lacked sufficient detail which Shedrofsky considered an extremely fast turn around (Ex.8) (Shedrofsky Tr.78).  On the other hand, it took Cappelli's architect over three weeks to review Precision's shop drawings which were returned to Precision as "rejected" without a single comment, correction or any direction explaining why the drawings had been rejected (Ex. 8).  Shedrofsky testified that "the most critical part of this job was the approval of the shop drawings so that everybody understood what they were building" and yet the shop

drawings came back without any directions (Shedrofsky Tr.19-23).   The day after Precision's

shop drawings were rejected, Precision contacted HRH and then submitted its second submission

of shop drawings (June 27, 2003) which were finally approved and returned to Precision on July

7, 2003 (Ex. 8).  Immediately after the shop drawings were approved, Precision placed its order

to Brazil for the stone materials on July 11, 2003 (Ex. 8).

     Burton's testimony is unsupported by any written evidence  that Precision was delaying

its work and is so divergent from the documentary evidence along with the corroborating

testimony of Shedrofsky and Tibett, that there are no areas of grey with respect to who is telling

the truth.  The documentary evidence speaks for itself and defies Burton's generalized defensive

and self serving testimony (Burton Tr. 9).

**Precision Was Directed to Finish its Work on**
**Overtime Due to HRH's Mismanagement of the Project**

     On June 26, 2003, Precision wrote a letter to HRH that clearly articulated the problems

that Precision confronted on the Project due to no fault of Precision (Ex. 7).   Precision's June 26th

letter was in response to HRH's June 25, 2003 self-serving letter complaining to Tibett that

Shedrofsky would not agree to order the 2' by 2' pavers without HRH's sign off.  Shedrofsky

responded:

> You are correct in your last paragraph wherein you state that the stone production
> must conform to approved shop drawings.  Unfortunately, this day we do not have
> approved drawings and still don't have final coordinated dimensions.  The
> architect's note on our shop drawings state that the GC is to coordinate the
> dimensions with the other trades.  Someone needs to approve the dimensions on
> our drawings.  Your demand that we immediately order stone when you know we
> don't have approved shop drawings in one sentence and in another sentence
> reiterate that the need to have approved shop drawings before production is more
> than a bit confusing.  Yesterday, I spoke to you about the architect's note that
> changed the stone coating to 1' - 4" from 1' - 0".  You weren't sure of why this

change was made and wanted to get back to me. I would like to know how we were supposed to order stone when you yourself don't know what size the coping is supposed to be (Ex.7).

Precision's complaints concerning the lack of direction from the architect and HRH's failure to confirm with the trade contractors dimensions were prophecies of future problems. As it turned out the concrete substrates for two of the four ponds were constructed to the wrong dimensions which caused major delays. During the trial, Precision showed that Burton lacked the knowledge on how to build this type of fountain and that it was HRH's overall 'mismanagement' of the Project that allowed substrates to be built to the wrong dimensions. On August 18, 2003, Precision did a preliminary layout dimension of Pond No. 4 where Precision discovered that the size of the concrete foundations were not built correctly and immediately brought this to HRH's attention (Shedrofsky Tr.36). Precision pointed out in its August 18, 2003 letter to HRH advising that the substrates were built incorrectly was an "urgent" matter (Ex.11). Shedrofsky explained at trial that the substrate issue was a serious problem which caused Precision significant delays:

> Understand that these substrates are no little thing. Its not just a little bit of foundation wall, couple of feet thin that could be moved. These things were tremendous. They were probably - - I am not exactly sure how far they went into the ground, maybe 10 feet....They were built wrong and they were, I believe about 8" off.  What happened was that the concrete subcontractor built the substrates pursuant to the original drawings that showed a 12' by 12' pile and were never made aware by HRH that the veneer would change to 2" thick (Shedrofsky Tr. 36-37).

Despite Precision's "urgent" warning that the substrates for Pond No. 4 were built wrong, incredibly HRH allowed the concrete contractor to proceed with Pond No. 3 in the same manner and it was also built to the wrong dimensions (Ex.12). On August 26, 2003 (Precision was scheduled to have already started its installation) a meeting was held on the job site where HRH

came up with a so-called solution to solve the incorrect construction of the substrates.  HRH

decided to have a demolition crew cut back the concrete to the needed dimensions (Burton Tr. 59-

69).  Precision documented these discussions by preparing Meeting Minutes (Ex.12).[6]

Shedrofsky and Tibett explained how Burton's 'solution' to cut the concrete back caused havoc to

the job site conditions  and delayed Precision start date for the stone installation.  Shedrofsky

testified:

> I mean it's quite -- I never saw anything like this, quite honestly.  And the thing
> that's incredible to see on these pictures [Exhibit 18] is that these foundation walls
> have a lot of steel in them, rebar.  And, you know, when you put anchors to hold up
> stone, you're supposed to have a nice, pretty nice concrete flush wall so these
> anchors sit kind of flat and flush.  I would love you to look at these pictures.
> Because what happened when they built -- when they started cutting back these
> concrete, it's like it was a, just a demolition zone.  The concrete was -- you could
> imagine trying to cut back eight  inches of concrete.  It's a mess.  So we then had
> additional task of now anchoring to a very uneven wall.

> ***

> I just -- I mean I think what's important here is to start to look at some of these
> dates.  Here we are in the middle of September and I still cannot get started.

> ***

> It is now 9/16 and the substrates work on ponds three and four is still not complete.
> I was supposed to start on August 25th, and now almost three weeks later they still
> don't have me ready to start.

> ***

> So, by the way, all that stone that we flew here that was sitting across the street in
> this storage area, was sitting there for three weeks waiting to be installed, but we
> couldn't install it because the concrete was a mess. [Shedrofsky Tr. 41-42]

---

[6]   In fact,  Precision was the only party that kept "Meeting Minutes" despite the fact that
this was the responsibility of HRH as the Construction Manager (Shedrofsky Tr. 36).

Tibett testified to the same effect:

> A. Well, I mean if you would talk to anybody in the stone, you know, industry and that does stone installation, they would tell you, most immediately, that these conditions of the elevation surfaces would not be sufficient for stone installation. And just, you know, also goes to show Mr. Burton's lack of any experience or knowledge about stone installation and what's necessary as far as a substrate for stone application, which became quite apparent, actually, in this project that Mr. Burton's lack of knowledge or understanding or ability to even listen to what our concerns were. [Tibett Tr.103]

> \*\*\*

> The concrete that was poured did not follow these drawings. So when you talk about build in place or whatever he -- the terminology that he used is absolutely ludicrous. And then if you refer back to one of the letters that my company had provided to him explaining to him these difficulties that we were having, because obviously talking to him in the field wasn't getting us any place, other than just being bullied had around, was you can see that there's an urgent letter that went out from our firm talking about a reference line of theirs, the center line of their project which is -- now this is something that is again the most simple thing when you talk about construction.

> \*\*\*

> ......When you look at a set of shop drawings like, like these that we provide, it clearly shows you sections of exactly where that concrete needs to be. I mean, there's no like guessing about it. It's very very clear. And, you know, so the first thing that was put in place on this job site was the these concrete fountains, which were poured absolutely incorrectly and had nothing to do with what we had provided as an approved set of shop drawings. [Tibett Tr. 108-109]

The delays caused the incorrect construction by the concrete subcontractor of the substrates, which in turn delayed Precision's stone installation and was the basis for HRH ordering Precision to perform its work on overtime. There is no dispute between the parties that Precision was issued a change order in the amount of $50,000.00 in order to accelerate the fabrication of the granite and have the stone air freighted to the site from Brazil.[7] There is also no

---

[7] Ironically, Cappelli insisted that Precision air freight the stone which is very expensive and the stone ended up being stored on the site for 3 weeks before Precision could start its

dispute that the materials were delivered to the Project site on time (Burton Tr. 9).  The real issue here is that Fuller/Cappelli did not want to pay Precision for the overtime work that it directed Precision to perform in order to complete the Project on time because it paid Precision a $50,000.00 change order to expedite fabrication and delivery of stone which could not be installed due to incorrect construction of the substrates which was HRH's fault.

HRH/Fuller/Cappelli's back-charges for Berardi's overtime work for the paver installation has neither a logical or legal basis to support its position.  Defendants argue that because the dates set forth in Precision's August 12, 2003 correspondence were "drop dead dates" (Ex. 9 and Ex. I) that HRH was justified in taking the paver installation work away from Precision and on top of that, entitled HRH to back-charge Precision for the alleged over time it paid Berardi Stone to complete the paver installation.  Precision's August 12, 2003 letter to HRH agreed: (a) to start the pond installation on August 25, 2003; (b) complete the black granite installation by October 17, 2003; (c) to start the paver installation on September 15, 2003; and (d) be completed by October 25, 2003.  However, Precision made it abundantly clear that in order to adhere to these dates, the following conditions were required to occur first:

1. In order to transport materials around the site, a clear path of poured concrete substrate will be needed at all locations.
2. Complete true substrate will be completed one week prior to scheduled installation.
3. An irrevocable addition to the contract payment of $50,000.00 provided to Precision Stone Inc. (by 8/15/03) to cover fabrication overtime and air freight material.
4. COD payment for materials as it is delivered to the site ( Ex. 9).

HRH had no authority to take away the paver work from Precision's scope of work.  HRH did so without obtaining Precision's consent and without compensating Precision for its lost profits on the paver work.  Precision gave Fuller a credit  for the paver installation *albeit* it had no

installation because of the site conditions (Shedrofsky Tr. 43).

12

contractual obligation to do so because it did not want to give Fuller an excuse not to pay

Precision. Precision gave Fuller a credit in the amount of $134,550.00 ($15.00 per sq. ft. x 8970

per. sq. ft). Fuller calculates the credit at $16.00 per sq. ft. making it $143,520.00. The dispute

for the credit is $8,700.00. Shedrofsky testified that Precision did not agree nor was he ever told

by HRH that it was going to take the paver work out of Precision's scope of work and only first

became aware of this when another contractor, Berardi Stone, showed up on the site in or around

October 2003 and started the paver installation (Shedrofsky Tr. 51). The actual pavers were

supplied by Precision, unloaded by Precision and stacked and stored by Precision. $15.00 per sq.

ft. was a "more than a generous credit for this work" (Shedrofsky Tr. 51). *Albeit*, Precision's

original bid quote was $16.50 per sq. ft. for the paver installation, this amount calculated and

included all the handling work and shop drawings for the pavers (including overhead and profit)

which Precision performed and reduced when it agreed to perform the entire scope of work for

$515,000.00 (Shedrofsky Tr.51-52). Precision also charged $15.00 per sq. ft. for the small

amount of the paver installation work it performed (Shedrofsky Tr.53, Ex. 5). The $15.00 per sq.

ft. credit as opposed to Cappelli's $16.00 is also justified by the fact that HRH took away the

paving installation work without any notice to Precision and does not take into consideration

Precision's overhead and profit. It is customary in the construction industry that if work is deleted

from the scope of work, the contractor is entitled to overhead and profit. In fact, the proposed

contract HRH sent to Precision although never signed, provides exactly that:

> Any increase or decrease to the Contract Price resulting from a
>
> change in the scope of the work shall be limited to 10% in aggravate
>
> for overhead and profit. (See Ex. 2, ¶149).


Precision's credit for the paver installation is actually less than 10%.

**Fuller's Alleged Back-charges Against Precision Are Not**
**Legally Sustainable and Unsubstantiated**

Precision established at trial and as demonstrated above that it should have been paid for

the overtime work it performed at HRH's direction for a total of $37,292.00 (Exs. 5, 16 and 17).

However, setting aside the overtime work for a moment, Precision's undisputed contract balance

due and owing would still be $104,839.00 but for the trumped up back-charges HRH/

Fuller/Cappelli belatedly assessed against Precision only after it demanded payment long after its

work was completed.  According to the Defendants, the back-charges are summarized as follows:

(1) $33,184.00 Fuller paid Berardi Stone to finish the paver installation on overtime; (2) $40,7000

for use of Fuller's 'cherry picker' (a crane) on the site; and (3) $14,800.00 for the labor operator

of the cherry picker.  These back-charges assessed against Precision's totaling $88,684.00 are

entirely unjustified and unsupportable.  Assuming *arguendo* that Fuller had a basis for these back-

charges, Defendants failed to introduce evidence at trial, documentary or otherwise (or in

discovery for that matter) showing that Fuller ever paid Berardi or that it incurred any out of

pocket costs for the cherry picker.

Defendants justify the assessment of the Berardi back-charge because they claim that the

dates set forth in Precision's August 12, 2003 correspondence were "drop dead dates" (Ex. 9 and

Ex. I) and in turn, Fuller was justified in taking away the paver installation work away from

Precision, for which Precision gave a credit for, and on top of that can back-charge Precision for

the alleged over time it allegedly paid Berardi Stone to complete the paver installation.  The so-

called 'drop dead dates' are referred to in Precision's August 12, 2003 letter to HRH were literally

made impossible to meet because the substrates were built wrong.  It is important to keep in mind

that as of August 12, 2003, HRH had not even sent a proposed contract to Precision.  The first

time Precision received a copy of a proposed contract was on September 17, 2003 when Precision

was one month away from being completed[8] (Ex. 2).   Burton testimony that from the beginning

Precision was not performing flies in the face of reality since he never even requested that

Precision return a signed agreement and simply not believable (Burton Tr. 47).

As discussed in detail above, it was impossible for Precision to meet any of the dates

referenced in its August 12th letter because as of September 26, 2003, Precision could not even

start its installation because the substrates were not ready.   On September 15, 2003, Precision

wrote the following letter to HRH:

> Your letter dated 9/9/03 has criticized the mobilization and manning of the stone
> installation that we are contractually obligated to finish by 10/24/03.  This criticism
> totally misrepresents the facts regarding our agreement and the status of the work
> available for our installation.
>
> Firstly to date we still do not have a contract for this installation.  We did agree
> with Louis Cappelli that we would use the additional $50,000.00 that he offered to
> expedite delivery of material and we would do our best to complete the installation
> by 10/24/03.  All parties understood that we would need to start working on pond
> #3 & #4 on 8/25/03.  It was also understood that to complete this very aggressive
> schedule that we would need to work on numerous areas without delays caused by
> incomplete substrates.
>
> It is now 9/16/03 and the substrate work on Pond #3 and Pond #4 is still not
> complete.  Today is the first day we can install stone on Pond #3 and due to
> adjustments needed to the substrate on Pond #4 we are stopped from working on
> that Pond (Ex. 13).

The above letter was never answered by HRH.  Fuller's attempt to back-charge Precision

for 37 days of use of the cherry picker crane at $1,100.00 per day for a total of $40,700.00 plus

$14,800.00 for the operator is outrageous and out right deceitful. Both Shedrofsky and Tibett

testified that there was a handshake agreement in the field between Jon Bush of Precision and Jim

---

[8]   Precision never signed any contract with Fuller/Cappelli and never agreed to a time of
the essence provision and in fact crossed it out when it returned the contract draft back to HRH
unsigned (Ex. 2).

Green, HRH's superintendent, that because of the site conditions (namely, because of the

demolition of the concrete due to the incorrect construction of the substrates along with the

additional Starbucks Kiosk), there was no available room on the Project site for Precision to use

its lull[9] and they agreed to a swap where Fuller could use Precision's lull and Precision could use

Fuller's cherry picker.  Precision delivered the lull to the Project site in early September and for

the majority part of the job was unable to use its lull due to the job site conditions because the

only other access to the site was blocked by HRH's crane (Tibett Tr. 97).   Tibett showed the

Court with the photographs of the Project site conditions that there would be no way to access the

lull (Ex.18).  On cross examination Shedrofsky testified to the same effect without the benefits of

the photographs:

> But you have to understand that we didn't need that  machine.  The way that the job
> was, we had a lull on that job. That's a big machine that carries a lot of heavy
> stones that  needs a flat surface and a clear path to move around the site.  And then
> to be able -- we were going to use that machine -- that was the machine intended to
> use for this installation. The problem arose was that the substrate that was
> supposed to be clear and open was not.  It was -- there were [t]renches throughout
> the site.  It was so many people working on  the site.  It was not anything that
> where this lull was going to be able to be used.  And we were going to save time.
> Jim -- Jim Green deemed it necessary to save that time and to use the cherry picker
> (Shedrofsky Tr. 69).

Burton's testimony that he had discussions with Shedrofsky that Precision was going to be

charged for its use of the cherry picker is simply not credible.  HRH is a sophisticated construction

management company and yet Burton was unable to produce even one piece of paper

documenting that Precision would be back-charged for any use of the cherry picker swap.

---

[9] A lull is a telescoping forklift and Precision anticipated using a lull to install the granite
for the Fountain the stone when it agreed to perform the stone work as it is the 'practical piece of
equipment for this type of installation.' Tibett also testified that Precision owns a cherry picker
and that if that was the proper piece of equipment to use for this Project, Precision would have
used its cherry picker in the first instance rather than the lull (Tibett Tr.97-98).

Moreover, HRH never denied that it used Precision's lull and yet never offer to pay Precision for its use. Defendants are asking the Court to warrant a back-charge for 37 days of use of the cherry picker at $1,100.00 per day without producing even a shred of evidence supporting this rental rate or the actual amount of days Precision actually used the cherry picker.

For the reasons set forth above, Precision should be granted judgment against the Defendants in the amount of $142,,131.69, plus interest as of January 1, 2004.

## POINT 2

### THE COURT'S DECISION FINDING PLAINTIFF'S COMPLAINT WAS FILED WITHIN ONE YEAR AFTER THE PRINCIPAL 'CEASED WORK' IS THE LAW OF THE CASE

At the close of Precision's direct case, Defendants moved to dismiss Precision's Complaint on the grounds that it was time barred pursuant to the provisions of the Bond which required Precision to commence an action with one year from the time Fuller ceased work on the Project. Specifically, Defendants erroneously argued that the Project was completed in the end of October 2003 which would have required Precision to have commenced its action against the Bond by the end of October 2004. Precision's complaint was commenced on December 17, 2004.

The Bond at issue provides that "any beneficiary-claimant hereunder who has not been paid in full within ninety (90) days after the date on which the last of such claimant's work or labor was done or performed or materials furnished, may sue the Surety and Principal on this bond for such sum as may be justly due, provided, however, *that no such suit or action shall be commenced hereunder by such claimant after the expiration of one (1) year following the date on which the **Principal ceased work** on said contract* nor other than in a State Court or United States District Court or competent jurisdiction in and for the County or District in which the contract work is situated.

17

required to file its action against the Bond when Fuller reached substantial completion. Defendants' entire argument was premised on this erroneous contention. The bright line test is whether Precision commended its action before Fuller *'ceased work'* on the Project and the Court found that it did. The achievement of substantial completion is a far cry from when the work on the Project ceases. Defendants only basis for its contention that Precision's claim was time barred was its misguided reliance on the public opening of the Fountain on October 27, 2003. The punch lists Defendants introduced into evidence at trial indisputably show that as of March 2004, Fuller was still performing physical work on the Project (Exs. A, B, and C) and had consequently not ceased work. Precision did not bear the burden of proving the date on which Fuller ceased work on the Project and since the Defendants failed to prove that Fuller ceased work on the Project prior to December 17, 2003, the Court correctly found that Precision's action was timely commenced.

## POINT 3

## DEFENDANTS' HAVE  WAIVED THEIR  RIGHT TO A "SETOFF"

It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case.   As a general rule, failure to plead an affirmative defense results in waiver of the defense and it is excluded as an issue in the case. Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir.1984); Troxler v. Owens-Illinois, Inc., 717 F.2d 530, 532-33 (11th Cir.1983); Ranger Insurance Co. v. Culberson, 454 F.2d 857, 862, n. 1 (5th Cir.1971) (fraud and misrepresentation); Systems Inc. v. Bridge Electronics Co., 335 F.2d 465, 466 (3rd Cir.1964) (duress, fraud, and misrepresentation); Worster Motor Lines, Inc. v. Lombardo, 531 F.Supp.106, 110 (W.D.Pa.1982) (setoff to a contract is an affirmative defense that is waived by failure to

plead); <u>Bernard v. U.S. Aircoach</u>, 117 F.Supp.134, 137-8 (S.D.Cal.1953) (If a defendant has an affirmative defense it should be "pleaded in the original answer or some seasonably made amendment thereto"). <u>See also</u> 5 C. Wright & A. Miller, Federal Practice and Procedure, Section 1278 at 339 (1969).

Furthermore, affirmative defenses are not raised by the assertion of a general denial. <u>Dobbs v.Vornado, Inc.</u>, 576 F.Supp.1072, 1080-81 (E.D.N.Y.1983); <u>Affiliated Music Enterprises v. Sesac, Inc.</u>,17 F.R.D. 509, 512 (S.D.N.Y.1955); <u>see also</u>, C. Wright & A. Miller, Federal Practice and Procedure, Section 1278 at 343 (1969).   Affirmative defenses are pleadings that must comply with the Federal Rules of Civil Procedure by including a short and plain statement of the basis for the defense. <u>Heller Fin., Inc. v. Midwhey Powder Co.</u>, 883 F.2d 1286, 1294 (7th Cir.1989).

Defendants' answer fails to plead that it is entitled to a setoff for the purported back-charges against Precision.  A "setoff" is a "counter demand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."  Blacks' Law Dict. 1376 (7th ed.1999).  A "recoupment" is a "[r]eduction of a plaintiff's damages because of a demand by the Defendant arising out of the same transaction." Blacks' Law Dict. 1280 (7th ed.1999).  Nowhere in the Defendants' answer, including their two affirmative defenses, do the Defendants allege, directly or inferentially, that Defendants have a counter demand against Precision.  Accordingly, the Defendants' two affirmative defenses failed to sufficiently plead either a setoff or recoupment and must be stricken. <u>See</u> <u>Minalga v. Fid. Invs. Institutional Operations Co.</u>, 2002 WL 31527251 (N.D.Ill. 2002).

20

## POINT 4

## PLAINTIFF SHOULD BE AWARDED ATTORNEYS' FEES AS DEFENDANTS' DEFENSE WAS BASELESS

Plaintiff seeks recovery of its attorneys' fees in this action from the defendant carriers under section 137(c) of the New York State Finance Law which provides in pertinent part "[t]he Court may determine and award reasonable attorney's fees to either party to such action [to recover upon a payment bond issued on a public Project] when, upon reviewing the entire record, it appears that either the original claim or the defense interposed to such claim is without substantial basis in fact or law."

Such claim for attorneys' fees is not a separate cause of action.  It is simply a remedy which the court can determine once the full trial has occurred and there can be a review of "the entire record" as the statute provides.  Indeed, in Beninati Roofing & Sheet Metal Co., Inc., v. Gelco Builders Inc., 279 A.D.2d 412 (1st Dept. 2001), the Court awarded attorneys fees to the bond claimant against the payment bond surety on the basis of a motion made at the conclusion of the trial such as the case here.  R.W. Granger & Sons, Inc., and United States Fidelity & Guaranty Company v. Rojac Company, Inc.,1999 WL 461800 (2d Cir. 1999).  No separate cause of action needs to be pleaded.

Moreover, if the Court determines (as it should) that the defense interposed by the Defendants was based only on the information from its principal, Fuller without conducting an independent investigation then it should award plaintiff attorneys' fees because Defendants had a fiduciary obligation to make its own independent investigation of plaintiff's claim as well as the merits of its principal's defense.  If the Defendants had made the minimal effort to perform an independent investigation it would have easily learned that Fuller had not "*ceased work*" on the Project prior to December 17, 2003 as punch list and uncompleted work items remained open as late as March 2004.  They would have also learned that the back-charges were trumped up by

HRH/ Fuller/Cappelli  belatedly assessed against Precision only after it demanded payment long after Precision completed its work and there was an undisputed contract balance due Precision. Defendants concede that $5696.00 has been due Precision for three years now yet never paid a penny (Ex. J).   Accordingly, Defendant Sureties only defense is without any merit. Pennex Aluminum Co., a Div. of Metal Exchange Corp. v. International Fidelity Ins. Co., 818 F.Supp 772 (M.D. Pa. 1993) (citing §137 of the New York State Finance Law); Riluc Co. v. Reliance Insurance Co., 181 A.D.2d 1048 (4th Dept.1992).  They would have also learned that the back-charges were trumped up by HRH/Fuller/Cappelli belatedly assessed against Precision only after it demanded payment long after Prevision completed its work and there was an undisputed contract balance due Precision.

## **CONCLUSION**

It is respectfully requested that the Court grant judgment in favor of the plaintiff and against Defendants pursuant to a labor and material bond and grant plaintiff such further relief as this Court may deem just and proper.

Dated: New York, New York
        November 3, 2006

                    Respectfully submitted,

                    GOETZ FITZPATRICK LLP

                    By: _____
                        Jane Goetz
                    Attorneys for Plaintiff
                    One Penn Plaza, 44th Floor
                    New York, New York 10119
                    (212) 695-8100

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK   )

      Patricia Bahaw, being duly sworn, deposes and says, deponent is not a party to the action, is over the age of 18 years and reside in Queens County, New York and on the 3rd day of November, 2006, served the within **PLAINTIFF'S POST TRIAL MEMORANDUM OF LAW**, upon:

      Patrick Reilly, Esq.
      DelBello Donnellan Weingarten Tartaglia
      Wise & Wiederkehr, LLP
      Attorneys for Defendants
      Arch Insurance Company and
      Lumbermens Mutual Casualty Co.
      One Lexington Avenue
      White Plains, New York 10601

via Fedex (overnight delivery).

                                    Patricia Bahaw

Sworn to before me on this
6th day of November, 2006

Notary Public

MARY C. OSTERMANN
NOTARY PUBLIC, State of New York
No. 31-4987102
Qualified in New York County
Commission Expires October 7, 20 09

W:\janeg\Precision Stone\Arch\Post trial MOL\AOS.wpd