UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PRECISION STONE, INC.,

                                   Plaintiff,          Case No.: 04 CV-9996 (RWS)

   -against-

ARCH INSURANCE COMPANY and
LUMBERMANS MUTUAL CASUALTY CO.,

                                   Defendants.
-----------------------------------------------------------------X

## DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW

DelBello Donnellan Weingarten Tartaglia Wise & Wiederkehr, LLP
One North Lexington Avenue, 11th Floor
White Plains, New York 10601

1183177
0027015-012

This Post-Trial Memorandum is respectfully submitted on behalf of defendants Arch Insurance Company and Lumberman's Mutual Casualty Co[1].

This case involves Precision Stone's claim against the two sureties on the project payment bond for stonework performed for the construction of the Main Street fountain (the "Fountain Project") in White Plains, New York. The general contractor for the Fountain Project was George A. Fuller Co., Inc. ("GAFCO"). HRH was the construction manager. GAFCO hired plaintiff Precision Stone ("Precision") to do the stone installation work for the Fountain Project. HRH supervised Precision's work.

Precision's work was one part of the project. Other sub-contractors performed other parts of the work. Precision was hired in or about May, 2003. The fountain plaza was scheduled to open for the public by October 30, 2006. GAFCO and Precision agreed to a contract price of $515,000.00.

After allowance for payments and for credits, GAFCO contends the balance remaining due is $5,685.50. Precision claims the balance due is $142,131.69.

The evidence presents four issues concerning the balance due:

1) the overtime issue ($70,476.19 in dispute);

2) the cherry picker issue ($55,500.00 in dispute);

3) the unit cost for Berardi's paving stone installation ($8970.00 in dispute);

4) the charge HRH paid for a Saturday delivery of material for Precision ($1,500.00 in dispute).

The total disputed amount is $136,446.19.

---

[1] This Post-Trial Memorandum deals solely with the balance due calculation. The issue concerning timeliness of plaintiff's claim against the Payment Bonds was addressed in defendants' prior Memorandum.

*The Delays*

From the outset in May 2003, Precision did not move expeditiously to perform its obligations, ultimately causing the overtime costs that were incurred in October 2003.

HRH's project executive Dan Burton testified concerning Precision's slow performance (Tr 9/20/06, p. 6, 2-21):

> Q. Did Precision Stone proceed to start its work in a timely manner after the date of this letter of intent?
>
> A. No. I don't think so. No.
>
> Q. In what way did it not proceed timely?
>
> A. The whole project was on a real short time frame. It had to be done by late October, and it was important at this juncture, even in May, that Precision get started on shop drawings and acquisition of materials right away. And I don't think they did that.
>
> Q. In what way or in what detail did they fail to get started right away?
>
> A. We basically had a schedule that -- most of this material came from out of the country, Brazil, I believe. And it was very important to get shop drawings established and get all the stone cut so that it could be there sometime in August. That was pretty much the time frame necessary to get it finished in October. And they did not get their shop drawings out timely. They did not order the material timely. They never manned the job properly. I don't believe they ever had enough men to actually do the job during the whole course of it.

*1) The Overtime Issue*

The Overtime Issue represents a $70,476.19 dispute. There are two facets to the Overtime Issue: (i) the overtime costs that GAFCO had to pay Berardi in October 2003 to get the paving stones installed in time for the City's Grand Opening; and (ii) the overtime costs that Precision paid its own men in October 2003 to get the work done on time.

GAFCO paid Berardi $33,184.00 in overtime costs for its men (Tr 9/20/06 p. 24, 12-4). Precision paid $37,292.19 in overtime costs to its men in October and wants GAFCO to reimburse Precision for this cost (Pltff's Ex. 6, CO#3 and CO#4).

The May 14, 2003 contract between GAFCO and Precision was a fixed priced contract in the amount of $515,000.00 (Pltff's Ex. 4). For that price, it was Precision's obligation to get all the work done in a timely manner. By letter amendment to the contract dated August 12, 2003, GAFCO paid Precision an additional $50,000.00 on the condition Precision get its work done by the specified "drop dead date" of October 25, 2003 (Defs.' Ex. G).

Mr. Burton testified about why the August 12, 2003 letter agreement became necessary (Tr 9/20/06, p. 8, 2-25):

> Q. Did you have discussions with him about this letter?
>
> A. Yes. At this juncture, it was my opinion that the materials should be there by now, and it was evident that it wasn't there and it wasn't destined to be there in an appropriate time frame. So at this point we simply made an agreement that we'll pay to put some of this stuff to get started on an airplane -- we'll airship material to the job, but as soon as it gets there, you guys have to tool up, man up and get this job finished.
>
> And the term that we used was a drop-dead rate. It's an agreement on both of our parts that you must be finished by a given date no matter what, and I believe in my mind that's what this agreement is. I paid $50,000 to them to accelerate the shipment -- the fabrication and shipment of the material that I felt should have been on the job already, but I didn't have much of a choice at this point other than to pay something to get the job accelerated.
>
> Q. Was that $50,000 above and beyond the prior agreed contract price?
>
> A. Yes, it was.
>
> Q. And was that amount paid?
>
> A. Yes, it was.
>
> Q. And did Mr. Shedrofsky agree to these drop-dead rates?

A.   Yes. This was an agreement between us.

Despite the August 12, 2003 agreement, Precision continued to delay. Mr. Burton testified to these delays (Tr 9/20/06, p. 9, 7-21):

Q.   Now, after this -- and this agreement was -- well, this exhibit is dated August 12th of 2003. Is that the date you signed it?

A.   I believe so, yes.

Q.   And after the signature of this agreement, did Precision proceed with its work in a timely manner?

A.   They did not. We did get the material there. The airfreighted material got there. They began to go to work, but they never really put enough men on the job to get this done in the appropriate time frame, and I was complaining constantly and daily about their lack of interest and their lack of men on the job.

Q.   Who did you complain to?

A.   Rob Shedrofsky was my only contact at Precision.

Q.   What did he say to you about your complaints?

A.   He was constantly in my mind making up any excuse imaginable not to be there with adequate men and material, like, again, maybe -- he always complained about job conditions or substrate or the method in which we were doing the job, and we never, ever really agreed on how to do the job. Rob always had an opinion completely opposite mine.

HRH sent Precision a letter dated September 9, 2003 stating that Precision's startup, mobilization and manning had been inadequate and that production must be drastically increased to meet the mandatory completion date. (Defs.' Ex. H). In October 2003, it became clear that Precision was not going to finish its work on time. At that time, GAFCO hired Berardi and most of Precision's paving stone installation work was given to Berardi, leaving Precision to concentrate on its other work. Berardi's invoice (Defs.' Ex. E) shows that Berardi began work

October 4, 2003. For its work during October, GAFCO not only had to pay Berardi $16.00 per sq. ft. to install 8,970 sq. ft. of paving stones (total $143,520.00) but also had to pay Berardi $33,184.00 for overtime that was necessary. (Tr 9/20/06, p. 23-24). All this work was within the scope of Precision's work and had been Precision's responsibility to complete for the original $515,000.00 price.

All of the costs incurred for overtime work were incurred after the August 12, 2003 agreement (Defs.' Ex. G) specifying the drop dead date, pursuant to which GAFCO agreed to add $50,000.00 to the contract price. If Precision had proceeded with its work timely and with adequate manpower, none of the Berardi overtime costs ($33,184.00) would have been incurred by GAFCO.

Likewise, Precision's October overtime cost ($37,292.19) is its responsibility. Precision agreed to complete the work by the drop dead date and accepted the additional $50,000.00 payment. Precision's failure to perform does not entitle it to yet further payment.

### 2) *The Cherry Picker Issue*

The Cherry Picker Issue represents a $55,500.00 dispute. Mr. Burton testified (and it was conceded) that Precision used the GAFCO supplied cherry picker. Precision had its own cherry picker that it did not bring to the job site. Precision had only a lull on site that was used to transport stone from the storage area to the installation area. Mr. Burton described Precision's use of the cherry picker (Tr 9/20/06, p. 27, 25 to p. 29, 17):

> Q. Now, was there occasion when Precision Stone used equipment that was supplied by Fuller or someone else?
>
> A. Yes.
>
> Q. Can you explain what happened?

A. Yes. Right in the middle of the site, it was a very, very compressed site. There was no real room to move around, and we had a -- we, George Fuller, HRH, had a crane called the cherry picker set up right in the middle of the job. And there was a point that we were done with the cherry picker and would have moved it away completely and totally out of the way, but neither Berardi or Precision was in a position to get the material where it went, in that they had a piece of equipment on the job.

It's a big giant forklift called the lull, and the lull was primarily used just to pick the material up from across the street from a storage yard that we had across the street. It would bring it back to the proper side or the fountain side of the street, but all they could do is set it down. They couldn't put it where it goes. They could just set it down.

So the crane or the cherry picker was necessary to reach over the fountains from its position. It was sitting right in the center of all the fountains. It can reach over from its position, pick up material at the curb or wherever the lull could set it down, swing over the fountains and put it exactly where it was needed for installation.

We also used the rein to hold up the heavy pieces of granite that were used to build the walls of the pool and the coping of the pool. They were much too heavy for men or a couple of men to handle them, or it was either fast or more expedient just to move them around with the cherry picker. So we left the cherry picker in place for as long as it was needed to get all the material where it went. And it really was Precision's obligation, responsibility to get the material where it was needed, but they simply didn't have a piece of equipment on site to do that.

Q. Did you have discussions with Mr. Shedrofsky about payment for use of the cherry picker?

A. I did actually. We never really, to be fair, discussed what it might cost, but I was saying at the time that whatever this cherry picker cost to leave it here, you're going to have to pay for at some point. He never agreed with me, but we did have the discussion several times.

Mr. Burton testified GAFCO's charge to Precision is a pass through of the actual rental cost incurred by GAFCO from United Rentals for the cherry picker (37 days at $1,100 per day, total $40,700.00) (Tr 9/20/06, p. 30). The charge to Precision for the GAFCO supplied cherry picker operator was calculated at 18.5 days at the union rate of $800 per day (total $14,800.00)

because Mr. Burton's best estimate was that the operator was on the cherry picker half time (Tr 9/20/06, p. 30-31).

Precision was contractually obligated to supply whatever equipment it needed to perform its work. Its use of the GAFCO supplied equipment and operator cost GAFCO $55,500.00 for which GAFCO is entitled to charge Precision.

### 3) *The Unit Cost for Berardi's Paving Stone Installation*

This issue represents an $8,790.00 dispute. It is undisputed that GAFCO paid Berardi $16.00 per square feet to install 8,970 sq. ft. of paving stones ($143,520.00), and that this work had been Precision's obligation to perform under the original scope. Precision argues however that GAFCO should only get a credit of $134,550.00 (using a $15.00 per sq. ft. basis).

Defs.'s Ex. E (the Berardi invoice) reflects the $16.00 per sq. ft. cost actually charged by Berardi and paid by GAFCO. Mr. Burton testified concerning his discussion with Precision (Tr 9/20/06, p. 25, 9 to p. 26, 2):

> Q. Now, if we go to the item that says "credit pavers", Mr. Shedrofsky had put in a credit for $134,550 based upon a $15 per square foot calculation. Do you see that?
>
> A. Yes, I do.
>
> Q. And did you have discussion with him as to the different -- or the reason why it would be $15 as opposed to $16?
>
> A. Yes. His price -- Precision's price to put in the stone was actually proposed originally, like, at $16.50. That was what they wanted per square foot to install the stone. But at some point, when I had to hire Berardi to put in the stone, he charged me $16. Rob's contention was that he shouldn't have to pay the whole $16, that he should be able to keep like the markup on the labor and material -- or on the labor category. And in his mind, I should be only paying $15 that didn't include the markup that he thought he was entitled to, but I never really understood that. And his original price was $16.50 per square foot, but my conversation with Rob was, if I paid $16, you have to pay the $16.

Precision is not entitled to negotiate the credit due for the cost actually paid by GAFCO. The cost paid Berardi was reasonable - in fact slightly less than the $16.50 per sq. ft. basis that Precision used in its pricing. Precision is obligated to pay (in the form of a credit) for the cost actually incurred by GAFO to get Precision's work completed on time.

### 4) *The $1500 HRH paid for a Saturday delivery of material for Precision*

It is undisputed that HRH paid the delivery charge for a weekend delivery of stone to the site. A copy of the HRH check in the amount of $1,500.00 is part of Pltff's Ex. 6. Precision claims that it is not obligated to pay the Saturday delivery charge. Mr. Burton testified (Tr 9/20/06, p. 26, 13 to p. 27, 2):

Q. There is a next item that refers to Saturday delivery, $1500. Whose obligation was it to pay for Saturday -- pay for deliveries to the site?

A. It was totally Precision's responsibility to pay, but on that particular juncture, we needed some material that actually was there on a Friday late. From memory, I think it was hung up in customs or something that didn't get out until late Friday. We needed it on the job Saturday. They refused to deliver it unless I paid on the spot if they delivered Saturday. So I authored an HRH check for $1500 and turned it over to a truck driver, who actually delivered that material on Saturday.

Q. And if you look for a moment at Exhibit 6, the third page of Exhibit 6, is that the check you're referring to?

A. Yes, it is.

Although Precision acknowledges the $1,500.00 payment was made, Precision has offset this credit with a $1,500.00 charge for "expedited transportation" (Pltff's Ex. 6, "CO #2"). The costs to get the material to the site are Precision's responsibility and this charge is invalid.

*Undisputed Extras*

GAFCO does not dispute that during the course of the job, GAFCO agreed to pay Precision an extra $4,000.00 for shop drawings and an extra $3,648.00 for installation of certain additional paving stones not originally covered by the drawings. These extras are not an issue in the calculation of the balance due.

*The Balance Due*

Accordingly, the final balance actually due is as follows:

| | |
|---|---|
| $515,000.00 | 5/14/03 contract price |
| +   50,000.00 | added to price by 8/12/03 agreement |
| 565,000.00 | |
| | |
| +   4,000.00 | extra (shop drawings) |
| +   3,648.00 | extra (paving stone installation) |
| 572,648.00 | |
| | |
| - 143,520.00 | credit for paving stones installed by Berardi at $16/sq. ft. |
| $429,128.00 | |
| | |
| -   33,184.00 | credit for overtime paid to Berardi |
| $395,944.00 | |
| | |
| -   40,700.00 | credit for rental cost of cherry picker |
| -   14,800.00 | credit for cherry picker operator time |
| $ 340,444.00 | |
| | |
| - 334,758.00 | amount paid |
| | |
| $    5,686.00 | net due |

GAFCO made payments to Precision totaling $334,758.50 (the amount of these payments is undisputed as reflected by Pltff's Ex. 6), resulting in a balance due as follows:

$340,444.00
-334,758.50
$5,685.50

## CONCLUSION

The exhibits and testimony at trial demonstrate that plaintiff's calculation of the balance due is inflated by omission of credits justly due to GAFCO and by the addition of charges for costs that are not the obligation of GAFCO. For this reason, it is respectfully requested that plaintiff's claims in excess of $5,685.50 be dismissed.

Dated: White Plains, New York
       November 2, 2006

DelBello Donnellan Weingarten Tartaglia
Wise & Wiederkehr, LLP
Attorneys for Defendants
Arch Insurance Company and
Lumbermans Mutual Casualty Co.

By: _____
    Patrick M. Reilly (3093)
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                         )ss:
COUNTY OF WESTCHESTER )

CHRISTINE WILLIAMS, being sworn says:

I am not a party to the action, am over 18 years of age and reside at White Plains, New York (office).

On November 2, 2006, I served a true copy of the annexed POST-TRIAL MEMORANDUM in the following manner:

by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:   Jane Goetz, Esq.
      Goetz Fitzpatrick LLP
      One Penn Plaza, Suite 4401
      New York, New York 10119

*Christine Williams*
CHRISTINE WILLIAMS

Sworn to before me this
2nd day of November, 2006

*Laura McMahon*
NOTARY PUBLIC

LAURA E. McMAHON
Notary Public, State of New York
No. 01MC6017348
Qualified in Orange County
Commission Expires December 14, 20 06

1187303
0027015-012