UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PRECISION STONE, INC.,

                                    Plaintiff,          Case No.:  04 CV-9996 (RWS)

        -against-

ARCH INSURANCE COMPANY and
LUMBERMANS MUTUAL CASUALTY CO.,

                                    Defendants.
------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION PURSUANT TO FED. R. CIV. PROC. 52(b)

**DelBello Donnellan Weingarten Wise & Wiederkehr, LLP**
**One North Lexington Avenue, 11th Floor**
**White Plains, New York 10601**
**(914) 681-0200**

## PRELIMINARY STATEMENT

Defendants, Arch Insurance Company and Lumbermans Mutual Casualty Co. ("Defendants"), respectfully submit this Memorandum of Law in opposition to Plaintiff's motion to amend the Court's findings of fact and conclusions of law set forth in the Court's Opinion, dated February 1, 2007 (the "Opinion").

This Memorandum is submitted without waiver or prejudice to Defendants' contentions as argued at trial that Plaintiff's claim against the Bond was time-barred in its entirety under the limitations provision thereof, or that by reason of additional credits and adjustments, Plaintiff was entitled to recovery of not more than $5,685.00.

## INTRODUCTION

This action involves Precision Stone's claim against two sureties that issued the project payment bond for the construction of the Main Street fountain (the "Fountain Project") in White Plains, New York. The general contractor for the Fountain Project was George A. Fuller Co., Inc. ("GAFCO"). HRH was the construction manager. GAFCO hired plaintiff Precision Stone ("Precision") to do the stone installation work for the Fountain Project.

After a bench trial on September 19, 20 and 25, 2006, the Court found there was an amount of $100,077.69 due Precision after applying adjustments, credits and payments made by Fuller directly to another stone contractor, Berardi Stone ("Berardi") who preformed part of Precision's stone installation work.

Precision subsequently filed its motion, pursuant to Rule 52(b), seeking to amend the Court's findings of facts and conclusions of law, arguing (1) that the Court should have found

in favor of Precision in the amount of $142,131.69; and (2) that the Court should have awarded pre-judgment interest to Precision.

## BACKGROUND

**A. Procedural Background:**

Precision commenced this action with the filing of a Complaint seeking damages against Defendants in the amount of $142,131.69.  Defendants filed an Answer denying the material allegations of the Complaint.

After a bench trial held on September 19, 20 and 25, 2006, the parties filed Post-Trial Memoranda of Law.  (A copy of Defendants' Post Trial Memorandum is annexed hereto and made a part hereof as **Exhibit A**, and a copy of Plaintiff's Post Trial Memorandum is annexed to Plaintiff's motion papers at Exhibit A.)

The Court issued an Opinion dated February 1, 2007.  (A copy of the Opinion is attached to Plaintiff's Memorandum of Law as **Exhibit B**.)

The Court held:

"Precision is entitled to payment for its material and labor under the Bond in the amount it expended, less the credit resulting from the substitution of Berardi with respect to the installation of the pavers." Opinion at 11.

Thus, it appears that the Court calculated the amount due to Precision based upon quantum meruit, rather than based upon a theory of breach of contract.  (In fact, a written contract was never executed by the parties.)  The Court computed the quantum meruit amount of $100,177.67 by taking the stated contract price, adding adjustments for changes that arose after work began, and subtracting credits and payments received by Precision.  The Court correctly applied a credit

in the amount of $176,604.00 for the payments made by Fuller to Berardi, for installation of the pavers that were part of Precision's scope of work to be performed for the stated contract price.

## DISCUSSION

**A. The Standard:**

Rule 52(b) provides, in pertinent part, that "[o]n a party's motion filed no later than 10 days after entry of a judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly." See also Hollis v. City of Buffalo, 189 F.R.D. 260, 262 (W.D.N.Y. 1999) (citations omitted) (holding that Rule 52(b) gives the Court broad discretion to amend its findings). See also Greenwood v. Greenwood, 234 F.2d 276, 278 (3d Cir. 1956) (citations omitted) (a party may file a Rule 52(b) based upon an opinion prior to entry of a judgment).

The standard governing consideration of a motion for an amendment of findings of fact under Rule 52(b) is the same as for a motion for reconsideration under Local Rule 6.3. See Wechsler v. Hunt Health Services, Ltd., 2004 U.S. Dis. LEXIS 19757 (S.D.N.Y.).

A motion to reconsider will generally be denied "unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). Further, the decision to grant or deny a motion for reconsideration or reargument is in the "'sound discretion of a district court judge and will not be overturned on appeal absent an abuse of discretion.'" Davidson v. Scully, 172 F. Supp. 2d 458, 462 (S.D.N.Y. 2001) (quoting McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir. 1983)). The motion to reconsider cannot properly advance "new facts, issues or arguments not previously

presented to the court." Id. at 461. A motion for reconsideration "is not a substitute for appeal and may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." Morales v. Quintiles Transnational Corp., 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998) (internal citations omitted). In determining whether a motion for reconsideration should be granted, Local Rule 6.3 should "be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." Dellefave v. Access Temporaries, Inc., No. 99 Civ. 6098, 2001 U.S. Dist. LEXIS 3165, at 1 (S.D.N.Y. Mar. 22, 2001); see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998) (noting that a motion for reconsideration should not sound as a dinner bell for a party wishing to take a second bite at the apple).

## B. The Opinion Did Not Overlook Law or Data:

### 1.    Calculation of Damages.

The Court computed damages by taking the base contract price, adding adjustments that the Court found in favor of Precision, subtracting payments made by Fuller to Precision, and subtracting credits for payments made by Fuller directly to Berardi. The Court included a credit in the amount of $176,604.00, representing Fuller's payments directly to Berardi for paver installation and overtime. Thus, the Court found that Precision was damaged in the amount of $100,077.69.

The Court noted that Fuller paid Berardi $143,520.00 for paver installation using the $16.00 per sq. ft. unit price and paid Berardi for overtime in the amount of $33,184.00. The Court correctly credited these payments totaling $176,604.00 against the balance allegedly owed to Precision, since Fuller made these payments directly to Berardi to complete work that Precision was required to do for the stated contract price. Precision's allegations for payment

based on <u>quantum meruit</u> are based on the stated contract price (said contract was never executed).  Thus, since the Court calculated the balance to Precision based upon the stated contract price, credits for payments to Berardi should be applied, since Precision did not perform this portion of the work and did not pay Berardi itself.

### 2.   Pre-Judgment Interest.

In a diversity case, the award of pre-Judgment interest is a substantive issue governed by New York law.  <u>See</u> <u>Schwimmer v. Allstate Ins. Co.</u>, 176 F.3d 648, 650 (2d Cir. 1999) (applying state law to the question of pre-judgment interest in a diversity case).  New York law explicitly affords the Court discretion to depart from the awarding of pre-judgment interest in cases of "an equitable nature." <u>N.Y.</u> <u>C.P.L.R.</u> § 5001(a) (<u>McKinneys</u>, 1997).

N.Y. C.P.L.R. Section 5001 provides that:

> "Interest shall be recovered upon a sum awarded because of a breach of performance of the contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, <u>except that in an action of an equitable nature, interest in the rate and date from which it shall be computed shall be in the court's discretion.</u>" (Emphasis added).

New York law has further held that the award of pre-judgment interest rests squarely in the discretion of the Court for a <u>quantum meruit</u> claim.  <u>See</u> <u>Precision Founds v. Ives</u>, 4 A.D.3d 589, 772 N.Y.S.2d 116 (3rd Dept. 2004); <u>see also</u> <u>C.P.L.R.</u> § 5000(a).  In <u>Precision Founds v. Ives</u>, the New York Appellate Division held:

> Turning to Supreme Court's award of preverdict interest to plaintiff, we note that such awards are discretionary for a quantum meruit claim (see CPLR 5001 [a]). Here, as already indicated, plaintiff waited almost four years after having rendered its services to bring this litigation. Under the particular circumstances herein, we do not find a sufficient basis for a discretionary award of preverdict interest on plaintiff's quantum meruit claim and, accordingly, reverse that award.

<u>Precision Founds. v. Ives</u>, 4 A.D.3d 589, 593 (3rd Dept. 2004)

Similarly, in the present case, it is properly a matter in the Court's discretion to not award pre-Judgment interest on Precision's <u>quantum meruit</u> claims.

As held in the <u>Sequa Corporation v. Gelmin</u>, 1997 U.S. Dist. LEXIS 5762:

> "Clearly, the language in C.P.L.R. § 5001(a) only requires the awarding of interest when a sum is awarded upon the breach of a contract. In equitable actions, such as the awarding of attorney's fees under <u>quantum meruit</u> as occurred here, the awarding of interest shall be in the Court's discretion and is not required. C.P.L.R. § 5001(a); <u>see also, Morgan v. Onassis</u>, 5 N.Y.2d 732, 177 N.Y.S.2d 714, 152 N.E.2d 670 (N.Y. 1958) (judgment based on lien for professional services modified to eliminate interest accruing prior to date of judgment). To construe C.P.L.R. § 5001(a) as requiring the awarding of interest in equitable actions would contravene the clear and unequivocal language of the statute and disregard basic rules of statutory construction."

The court in <u>Sequa</u> went further and specifically stated that it is not at odds with a previous S.D.N.Y case, <u>Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff</u>, 638 F.Supp. 714, 721 (S.D.N.Y. 1986), which held that pre-judgment interest is proper on equitable claims under New York law. The court in <u>Sequa</u> concluded that the <u>Kramer</u> court reached its decision regarding pre-judgment interest after exercising its discretion. Thus, the awarding of interest properly lies in the court's discretion.

It should be noted that Precision never made a demand for any payment from the sureties prior to its commencement of this action by the service of the Summons and Complaint on December 24, 2004. This date was approximately one (1) year after the date Precision had left the job. Precision's delay in the instant matter is analogous to the delay in <u>Precision Founds. v. Ives</u>, where the court exercised its discretion and held that due to Plaintiff's delay in commencing its action, interest would not be awarded on its <u>quantum meruit</u> award.

If the Court finds that pre-Judgment interest is appropriate in the present case, interest should only accrue no earlier than December 24, 2004, the date that the sureties first received notice of a claim upon the Bond. Under New York law:

> "In the event of payment [on a bond], the amount recoverable from [the] surety shall not exceed the amount specified in the undertaking except that interest in addition to this amount shall be awarded from the time of default by the surety." N.Y. Gen Oblig. Law § 7-301 (McKinneys 2001). This statutory rule codifies the older, common-law rule that "the surety on the bond[] is chargeable under New York law…with interest from the time the surety 'could have safely paid the [same,] providing [the surety] then unjustly withholds [payment]." United States v. Anchor Warehouses, Inc., 92 F.2d 57, 58 (2d Cir. 1937) (quoting Tuzzeo v. Am. Bonding Co., 226 N.Y. 171, 178, 123 N.E. 142 (1919)); see also Aetna Cas.& Surety Co. v. B.B.B. Constr. Corp., 173 F.2d 307, 309 (2d Cir. 1949)."

Thus, where pre-judgment interest is awarded in a bond case, interest is awarded from the time of the alleged default of the surety – not the alleged default of the contractor. This principle is illustrated in 11 N.Y. Jur., Bonds § 58, which states:

> "The principal's date of default does not determine the surety's date of default. Therefore, interest on the surety may not be computed from the happening of the condition on which the surety's liability is predicated, but only from the time when the surety could have safely paid the amount of its obligation and withheld payment. Specifically, a surety is not considered in default until it has been notified of the principal's default and unjustly withholds payment due under the bond. Accordingly, interest is calculated from the date of he surety's default, which is the date it received notice of its liability and withheld payment." (Citations omitted.)

## CONCLUSION

Plaintiff has not met its burden under Rule 52(b), since it has not established that the Court overlooked data or law in formulating the Opinion. Moreover, Plaintiff's motion is

merely an attempt for Plaintiff "to take a second bite at the apple." Thus, Plaintiff's motion should be denied in its entirety.

For the reasons set forth above, Defendants respectfully request that this Court deny Plaintiff's motion pursuant to Rule 52(b) in its entirety.

Dated: White Plains, New York
     March 15, 2007

                    Respectfully submitted,

                    DelBello Donnellan Weingarten
                    Wise & Wiederkehr, LLP
                    Attorneys for Defendants
                    Arch Insurance Company and
                    Lumbermans Mutual Casualty Co.

                    By: _____
                       Patrick M. Reilly (3093)
                    One North Lexington Avenue
                    White Plains, New York 10601
                    (914) 681-0200

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PRECISION STONE, INC.,

                                        Plaintiff,                Case No.:  04 CV-9996 (RWS)

          -against-

ARCH INSURANCE COMPANY and
LUMBERMANS MUTUAL CASUALTY CO.,

                                        Defendants.
-------------------------------------------------------------X

## DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW

**DelBello Donnellan Weingarten Tartaglia Wise & Wiederkehr, LLP**
**One North Lexington Avenue, 11th Floor**
**White Plains, New York 10601**

1183177
0027015-012

This Post-Trial Memorandum is respectfully submitted on behalf of defendants Arch Insurance Company and Lumberman's Mutual Casualty Co[1].

This case involves Precision Stone's claim against the two sureties on the project payment bond for stonework performed for the construction of the Main Street fountain (the "Fountain Project") in White Plains, New York.  The general contractor for the Fountain Project was George A. Fuller Co., Inc. ("GAFCO").  HRH was the construction manager.  GAFCO hired plaintiff Precision Stone ("Precision") to do the stone installation work for the Fountain Project. HRH supervised Precision's work.

Precision's work was one part of the project.  Other sub-contractors performed other parts of the work. Precision was hired in or about May, 2003.  The fountain plaza was scheduled to open for the public by October 30, 2006. GAFCO and Precision agreed to a contract price of $515,000.00.

After allowance for payments and for credits, GAFCO contends the balance remaining due is $5,685.50.  Precision claims the balance due is $142,131.69.

The evidence presents four issues concerning the balance due:

1) the overtime issue ($70,476.19 in dispute);

2) the cherry picker issue ($55,500.00 in dispute);

3) the unit cost for Berardi's paving stone installation ($8970.00 in dispute);

4) the charge HRH paid for a Saturday delivery of material for Precision ($1,500.00 in dispute).

The total disputed amount is $136,446.19.

---

[1] This Post-Trial Memorandum deals solely with the balance due calculation.  The issue concerning timeliness of plaintiff's claim against the Payment Bonds was addressed in defendants' prior Memorandum.

*The Delays*

From the outset in May 2003, Precision did not move expeditiously to perform its obligations, ultimately causing the overtime costs that were incurred in October 2003.

HRH's project executive Dan Burton testified concerning Precision's slow performance (Tr 9/20/06, p. 6, 2-21):

Q.    Did Precision Stone proceed to start its work in a timely manner after the date of this letter of intent?

A.    No. I don't think so. No.

Q.    In what way did it not proceed timely?

A.    The whole project was on a real short time frame. It had to be done by late October, and it was important at this juncture, even in May, that Precision get started on shop drawings and acquisition of materials right away. And I don't think they did that.

Q.    In what way or in what detail did they fail to get started right away?

A.    We basically had a schedule that -- most of this material came from out of the country, Brazil, I believe. And it was very important to get shop drawings established and get all the stone cut so that it could be there sometime in August. That was pretty much the time frame necessary to get it finished in October. And they did not get their shop drawings out timely. They did not order the material timely. They never manned the job properly. I don't believe they ever had enough men to actually do the job during the whole course of it.

*1) The Overtime Issue*

The Overtime Issue represents a $70,476.19 dispute. There are two facets to the Overtime Issue: (i) the overtime costs that GAFCO had to pay Berardi in October 2003 to get the paving stones installed in time for the City's Grand Opening; and (ii) the overtime costs that Precision paid its own men in October 2003 to get the work done on time.

1186931.doc
0027015-012

2

GAFCO paid Berardi $33,184.00 in overtime costs for its men (Tr 9/20/06 p. 24, 12-4).
Precision paid $37,292.19 in overtime costs to its men in October and wants GAFCO to
reimburse Precision for this cost (Pltff's Ex. 6, CO#3 and CO#4).

The May 14, 2003 contract between GAFCO and Precision was a fixed priced contract in
the amount of $515,000.00 (Pltff's Ex. 4). For that price, it was Precision's obligation to get all
the work done in a timely manner. By letter amendment to the contract dated August 12, 2003,
GAFCO paid Precision an additional $50,000.00 on the condition Precision get its work done by
the specified "drop dead date" of October 25, 2003 (Defs.' Ex. G).

Mr. Burton testified about why the August 12, 2003 letter agreement became necessary
(Tr 9/20/06, p. 8, 2-25):

Q.   Did you have discussions with him about this letter?

A.   Yes. At this juncture, it was my opinion that the materials should be there
     now, and it was evident that it wasn't there and it wasn't destined to be
     there in an appropriate time frame. So at this point we simply made an
     agreement that we'll pay to put some of this stuff to get started on an
     airplane -- we'll airship material to the job, but as soon as it gets there, you
     guys have to tool up, man up and get this job finished.

     And the term that we used was a drop-dead rate. It's an agreement on both
     of our parts that you must be finished by a given date no matter what, and I
     believe in my mind that's what this agreement is. I paid $50,000 to them
     to accelerate the shipment -- the fabrication and shipment of the material
     that I felt should have been on the job already, but I didn't have much of a
     choice at this point other than to pay something to get the job accelerated.

Q.   Was that $50,000 above and beyond the prior agreed contract price?

A.   Yes, it was.

Q.   And was that amount paid?

A.   Yes, it was.

Q.   And did Mr. Shedrofsky agree to these drop-dead rates?

1186931.doc
0027015-012

3

A.      Yes. This was an agreement between us.

Despite the August 12, 2003 agreement, Precision continued to delay.    Mr. Burton testified to these delays (Tr 9/20/06, p. 9, 7-21):

Q.      Now, after this -- and this agreement was -- well, this exhibit is dated August 12th of 2003. Is that the date you signed it?

A.      I believe so, yes.

Q.      And after the signature of this agreement, did Precision proceed with its work in a timely manner?

A.      They did not. We did get the material there. The airfreighted material got there. They began to go to work, but they never really put enough men on the job to get this done in the appropriate time frame, and I was complaining constantly and daily about their lack of interest and their lack of men on the job.

Q.      Who did you complain to?

A.      Rob Shedrofsky was my only contact at Precision.

Q.      What did he say to you about your complaints?

A.      He was constantly in my mind making up any excuse imaginable not to be there with adequate men and material, like, again, maybe -- he always complained about job conditions or substrate or the method in which we were doing the job, and we never, ever really agreed on how to do the job. Rob always had an opinion completely opposite mine.

HRH sent Precision a letter dated September 9, 2003 stating that Precision's startup, mobilization and manning had been inadequate and that production must be drastically increased to meet the mandatory completion date. (Defs.' Ex. H). In October 2003, it became clear that Precision was not going to finish its work on time. At that time, GAFCO hired Berardi and most of Precision's paving stone installation work was given to Berardi, leaving Precision to concentrate on its other work. Berardi's invoice (Defs.' Ex. E) shows that Berardi began work

October 4, 2003. For its work during October, GAFCO not only had to pay Berardi $16.00 per sq. ft. to install 8,970 sq. ft. of paving stones (total $143,520.00) but also had to pay Berardi $33,184.00 for overtime that was necessary. (Tr 9/20/06, p. 23-24). All this work was within the scope of Precision's work and had been Precision's responsibility to complete for the original $515,000.00 price.

All of the costs incurred for overtime work were incurred after the August 12, 2003 agreement (Defs.' Ex. G) specifying the drop dead date, pursuant to which GAFCO agreed to add $50,000.00 to the contract price. If Precision had proceeded with its work timely and with adequate manpower, none of the Berardi overtime costs ($33,184.00) would have been incurred by GAFCO.

Likewise, Precision's October overtime cost ($37,292.19) is its responsibility. Precision agreed to complete the work by the drop dead date and accepted the additional $50,000.00 payment. Precision's failure to perform does not entitle it to yet further payment.

*2) The Cherry Picker Issue*

The Cherry Picker Issue represents a $55,500.00 dispute. Mr. Burton testified (and it was conceded) that Precision used the GAFCO supplied cherry picker. Precision had its own cherry picker that it did not bring to the job site. Precision had only a lull on site that was used to transport stone from the storage area to the installation area. Mr. Burton described Precision's use of the cherry picker (Tr 9/20/06, p. 27, 25 to p. 29, 17):

> Q. Now, was there occasion when Precision Stone used equipment that was supplied by Fuller or someone else?
>
> A. Yes.
>
> Q. Can you explain what happened?

A.   Yes. Right in the middle of the site, it was a very, very compressed site. There was no real room to move around, and we had a -- we, George Fuller, HRH, had a crane called the cherry picker set up right in the middle of the job. And there was a point that we were done with the cherry picker and would have moved it away completely and totally out of the way, but neither Berardi or Precision was in a position to get the material where it went, in that they had a piece of equipment on the job.

It's a big giant forklift called the lull, and the lull was primarily used just to pick the material up from across the street from a storage yard that we had across the street. It would bring it back to the proper side or the fountain side of the street, but all they could do is set it down. They couldn't put it where it goes. They could just set it down.

So the crane or the cherry picker was necessary to reach over the fountains from its position. It was sitting right in the center of all the fountains. It can reach over from its position, pick up material at the curb or wherever the lull could set it down, swing over the fountains and put it exactly where it was needed for installation.

We also used the rein to hold up the heavy pieces of granite that were used to build the walls of the pool and the coping of the pool. They were much too heavy for men or a couple of men to handle them, or it was either fast or more expedient just to move them around with the cherry picker. So we left the cherry picker in place for as long as it was needed to get all the material where it went. And it really was Precision's obligation, responsibility to get the material where it was needed, but they simply didn't have a piece of equipment on site to do that.

Q.   Did you have discussions with Mr. Shedrofsky about payment for use of the cherry picker?

A.   I did actually. We never really, to be fair, discussed what it might cost, but I was saying at the time that whatever this cherry picker cost to leave it here, you're going to have to pay for at some point. He never agreed with me, but we did have the discussion several times.

Mr. Burton testified GAFCO's charge to Precision is a pass through of the actual rental cost incurred by GAFCO from United Rentals for the cherry picker (37 days at $1,100 per day, total $40,700.00) (Tr 9/20/06, p. 30). The charge to Precision for the GAFCO supplied cherry picker operator was calculated at 18.5 days at the union rate of $800 per day (total $14,800.00)

because Mr. Burton's best estimate was that the operator was on the cherry picker half time (Tr 9/20/06, p. 30-31).

Precision was contractually obligated to supply whatever equipment it needed to perform its work. Its use of the GAFCO supplied equipment and operator cost GAFCO $55,500.00 for which GAFCO is entitled to charge Precision.

### 3) The Unit Cost for Berardi's Paving Stone Installation

This issue represents an $8,790.00 dispute. It is undisputed that GAFCO paid Berardi $16.00 per square feet to install 8,970 sq. ft. of paving stones ($143,520.00), and that this work had been Precision's obligation to perform under the original scope. Precision argues however that GAFCO should only get a credit of $134,550.00 (using a $15.00 per sq. ft. basis).

Defs.'s Ex. E (the Berardi invoice) reflects the $16.00 per sq. ft. cost actually charged by Berardi and paid by GAFCO. Mr. Burton testified concerning his discussion with Precision (Tr 9/20/06, p. 25, 9 to p. 26, 2):

Q.   Now, if we go to the item that says "credit pavers", Mr. Shedrofsky had put in a credit for $134,550 based upon a $15 per square foot calculation. Do you see that?

A.   Yes, I do.

Q.   And did you have discussion with him as to the different -- or the reason why it would be $15 as opposed to $16?

A.   Yes. His price -- Precision's price to put in the stone was actually proposed originally, like, at $16.50. That was what they wanted per square foot to install the stone. But at some point, when I had to hire Berardi to put in the stone, he charged me $16. Rob's contention was that he shouldn't have to pay the whole $16, that he should be able to keep like the markup on the labor and material -- or on the labor category. And in his mind, I should be only paying $15 that didn't include the markup that he thought he was entitled to, but I never really understood that. And his original price was $16.50 per square foot, but my conversation with Rob was, if I paid $16, you have to pay the $16.

Precision is not entitled to negotiate the credit due for the cost actually paid by GAFCO. The cost paid Berardi was reasonable - in fact slightly less than the $16.50 per sq. ft. basis that Precision used in its pricing. Precision is obligated to pay (in the form of a credit) for the cost actually incurred by GAFO to get Precision's work completed on time.

### 4) The $1500 HRH paid for a Saturday delivery of material for Precision

It is undisputed that HRH paid the delivery charge for a weekend delivery of stone to the site. A copy of the HRH check in the amount of $1,500.00 is part of Pltff's Ex. 6. Precision claims that it is not obligated to pay the Saturday delivery charge. Mr. Burton testified (Tr 9/20/06, p. 26, 13 to p. 27, 2):

> Q.  There is a next item that refers to Saturday delivery, $1500. Whose obligation was it to pay for Saturday -- pay for deliveries to the site?
>
> A.  It was totally Precision's responsibility to pay, but on that particular juncture, we needed some material that actually was there on a Friday late. From memory, I think it was hung up in customs or something that didn't get out until late Friday. We needed it on the job Saturday. They refused to deliver it unless I paid on the spot if they delivered Saturday. So I authored an HRH check for $1500 and turned it over to a truck driver, who actually delivered that material on Saturday.
>
> Q.  And if you look for a moment at Exhibit 6, the third page of Exhibit 6, is that the check you're referring to?
>
> A.  Yes, it is.

Although Precision acknowledges the $1,500.00 payment was made, Precision has offset this credit with a $1,500.00 charge for "expedited transportation" (Pltff's Ex. 6, "CO #2"). The costs to get the material to the site are Precision's responsibility and this charge is invalid.

1186931.doc
0027015-012

8

*Undisputed Extras*

GAFCO does not dispute that during the course of the job, GAFCO agreed to pay Precision an extra $4,000.00 for shop drawings and an extra $3,648.00 for installation of certain additional paving stones not originally covered by the drawings.  These extras are not an issue in the calculation of the balance due.

*The Balance Due*

Accordingly, the final balance actually due is as follows:

| | |
|---|---|
| $515,000.00 | 5/14/03 contract price |
| + 50,000.00 | added to price by 8/12/03 agreement |
| 565,000.00 | |
| | |
| + 4,000.00 | extra (shop drawings) |
| + 3,648.00 | extra (paving stone installation) |
| 572,648.00 | |
| | |
| - 143,520.00 | credit for paving stones installed by Berardi at $16/sq. ft. |
| $429,128.00 | |
| | |
| - 33,184.00 | credit for overtime paid to Berardi |
| $395,944.00 | |
| | |
| - 40,700.00 | credit for rental cost of cherry picker |
| - 14,800.00 | credit for cherry picker operator time |
| $ 340,444.00 | |
| | |
| - 334,758.00 | amount paid |
| | |
| $ 5,686.00 | net due |

GAFCO made payments to Precision totaling $334,758.50 (the amount of these payments is undisputed as reflected by Pltff's Ex. 6), resulting in a balance due as follows:

$340,444.00
-334,758.50
$5,685.50

## CONCLUSION

The exhibits and testimony at trial demonstrate that plaintiff's calculation of the balance due is inflated by omission of credits justly due to GAFCO and by the addition of charges for costs that are not the obligation of GAFCO.  For this reason, it is respectfully requested that plaintiff's claims in excess of $5,685.50 be dismissed.

Dated: White Plains, New York  
      November 2, 2006

DelBello Donnellan Weingarten Tartaglia  
Wise & Wiederkehr, LLP  
Attorneys for Defendants  
Arch Insurance Company and  
Lumbermans Mutual Casualty Co.

By: _____  
      Patrick M. Reilly (3093)  
One North Lexington Avenue  
White Plains, New York 10601  
(914) 681-0200

1186931.doc  
0027015-012

10